NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT


D.F.,                                )
                                     )
          Appellant,                 )
                                     )
v.                                   )        Case No. 2D17-2315
                                     )
STATE OF FLORIDA,                    )
                                     )
          Appellee.                  )
_____ )

Opinion filed July 6, 2018.

Appeal from the Circuit Court for Charlotte
County; Paul Alessandroni, Acting Circuit
Judge.

Kathleen A. Smith, Public Defender, and
Bridget Jackman, Assistant Public Defender,
Punta Gorda, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Caroline Johnson Levine,
Assistant Attorney General, Tampa, for
Appellee.


LaROSE, Chief Judge.

         D.F., who is the subject of a Baker Act proceeding, appeals the trial court's

order involuntarily committing him to an inpatient treatment facility for three months.

See § 394.467, Fla. Stat. (2016).  We have jurisdiction.  See Fla. R. App. P. 9.030(b)(1)(A).  We affirm.

## I. Procedural and Factual Background

The director of Riverside Behavioral Center in Punta Gorda filed a petition for involuntary inpatient treatment of D.F.  A magistrate held an evidentiary hearing on the petition.

D.F.'s psychiatrist, Dr. Hernandez, testified that D.F. suffers from a mood disorder and dementia.  As a result, D.F. was argumentative, refused to take his medication, and refused to eat.  Dr. Hernandez recounted that D.F. arrived at the Center mildly malnourished and disheveled.  He was "three pounds underweight since his last discharge" from a group home less than three months prior.  Dr. Hernandez testified that, without treatment, D.F. has "a higher risk to be wandering the neighborhood, getting lost, [and] maybe being a victim of exploitation due to his mental incapacity to make decisions."

Dr. Hernandez recommended that D.F. be placed in a closed facility in Sarasota County.  Twice in the past three months, D.F. was placed in less restrictive treatment programs (i.e., group homes), and "it backfired" on both occasions.  Dr. Hernandez testified that other facilities outside of Sarasota County would accept D.F., but D.F. refused to leave Sarasota County.  Dr. Hernandez also noted D.F. had no family or friends to care for him.

D.F. testified he was willing to go to a group home.  D.F. also testified that he could stay with a friend in Englewood or with a roommate at a hotel.  D.F. did not testify

that his friend or roommate were willing and able to help him.[1]  Neither the friend nor the roommate testified at the hearing.

The magistrate filed a report recommending involuntary inpatient placement in a closed facility in Sarasota County.  D.F. filed exceptions to the report.  The trial court conducted a hearing, approved the magistrate's report and recommendation with a three-month time limit, and entered the order now before us.

## II.  Mootness Issue

We could treat D.F.'s appeal as moot; more than three months have passed since the commitment order.  See L.P. v. State, 995 So. 2d 1140, 1141 (Fla. 5th DCA 2008) (holding L.P.'s request for appellate relief moot because the commitment order was effective for six months and more than six months had elapsed from the entry of the order).  We will not do so.

The issues on appeal are "capable of being repeated yet evading review."  See id.  The trial court committed D.F. to involuntary placement three times in a three-month period and referenced D.F.'s two prior commitments as one of its bases for committing him.  See id. (addressing an issue raised on appeal, even though L.P.'s request for appellate relief was moot, because "it [was] an important issue [that was] capable of being repeated yet evading review"); see also K.B. v. Fla. Dep't of Children & Families, 202 So. 3d 909, 912-13 (Fla. 3d DCA 2016) (concluding that K.B.'s claim was not moot because the involuntary commitment on appeal was "not the first time K.B. has

---

[1]D.F. did not know the last name of his friend.  D.F. refused to provide the last name of the roommate based on confidentiality.

- 3 -

been faced with potential confinement in the [Juvenile Addiction Receiving Facility] without judicial compliance with the Marchman Act").

### III. Standard of Review

We have previously explained the procedure, the trial court's standard of review, and this court's standard of review of a trial court order adopting a magistrate's report recommending involuntary placement in Baker Act proceedings. See In re Drummond, 69 So. 3d 1054, 1056-58 (Fla. 2d DCA 2011). The magistrate makes factual findings and applies the law to its factual findings "to reach a conclusion that a person either should or should not be committed." Id. at 1057. The trial court then examines the magistrate's report. Id. at 1056-57.

The trial court reviews the magistrate's factual findings with a presumption of correctness and must accept the findings if supported by competent, substantial evidence. Id. at 1056-57. Any factual findings affected by the magistrate's determinations of credibility of competency must be accepted, unless clearly erroneous. Id. at 1057. The trial court reviews de novo whether the magistrate applied the correct law to the facts.[2] Id. Generally, the trial court gives great deference to the magistrate's conclusions "[b]ecause this conclusion is based in large part upon evidence that the magistrate alone had the opportunity to see and hear." Id.

Thereafter, we "review de novo the trial court's decision that the findings of fact in a Baker Act case are supported by competent, substantial evidence and are not clearly erroneous while giving both the magistrate and the trial court the benefit of the

---

[2]"In a Baker Act case, this law is primarily statutory, so the determination of the correct law is a relatively simple process." Id. (citing §§ 394.451-.4789).

- 4 -

presumption of correctness." Id. We "review de novo to determine that both the magistrate and the trial judge applied the correct law." Id. We review "the trial court's decision to accept or reject the magistrate's conclusions under the abuse of discretion standard." Id.

## IV. Analysis

D.F. argues that the trial court erred by ordering D.F. to involuntary placement because the State failed to meet its burden that: (A) D.F. was likely to suffer from neglect that would pose a real and present danger of substantial harm to his well-being; and (B) all available less restrictive treatment alternatives would be inappropriate.

The State must prove "by clear and convincing evidence that the statutory criteria authorizing involuntary commitment have been met." Blue v. State, 764 So. 2d 697, 698 (Fla. 1st DCA 2000) (citations omitted). Section 394.467(1) sets forth the statutory criteria.

Specific to this case, the State must prove the following as to D.F.:

(a) He . . . has a mental illness and because of his . . . mental illness:

    1. a. . . .

       b. He . . . is unable to determine for himself . . . whether placement is necessary; and

    2. a. He . . . is incapable of surviving alone or with the help of willing and responsible family or friends, including available alternative services, and, without treatment, is likely to suffer from neglect or refuse to care for himself or herself, and such neglect or refusal poses a real and present threat of substantial harm to his . . . well-being . . .

       b. . . . ; and

- 5 -

> (b) All available less restrictive treatment alternatives which would offer an opportunity for improvement of his . . . condition have been judged to be inappropriate.

§ 394.467(1). D.F. does not dispute that he has mental illness. Nor does he challenge the finding that he was unable to determine for himself whether placement was necessary. Thus, only criteria (a)(2)(a) and (b) are at issue.

A. *Whether D.F. Posed a Real and Present Threat of Substantial Harm to His Well-Being, under Subsection (a)(2)(a)*

D.F. contends that "there was no evidence of specific occasions [when] D.F. posed a real and present threat of substantial harm to his well-being[,] . . . nor . . . any occasion on which such lapses of personal care on his part had resulted in substantial harm to his well-being."[3]

"[T]he need for treatment and medication and the refusal to take medication despite a deteriorating mental condition, standing alone, do not justify involuntary commitment under the Baker Act." Lischka v. State, 901 So. 2d 1025, 1026 (Fla. 1st DCA 2005). "Rather, there must also be clear and convincing evidence that without treatment, the patient would pose a real and present threat of substantial harm to himself . . . ." Id.; see, e.g., Lyon v. State, 724 So. 2d 1241, 1242-43 (Fla. 1st DCA 1999) (reversing involuntary commitment because the doctor's testimony merely "amount[ed] to an opinion that Mrs. Lyon would, if not on medication, neglect herself" where the doctor failed "to specify the nature of the self[-]neglect he anticipated in a way that established any real and present threat of substantial harm to her well-being").

---

[3]D.F. also argues that section 394.467(1)(a)(2)(b) is inapplicable. Because section 394.467(1)(a)(2)(b) is inapplicable, we focus on D.F.'s first two arguments.

- 6 -

D.F. relies heavily on Schexnayder v. State, 495 So. 2d 850 (Fla. 1st DCA 1986). In Schexnayder, the district court held that there was no evidence of specific occasions where the appellant's failure to take medication and care for herself resulted in substantial harm to her well-being. Id. at 852. Indeed, a doctor testified that "there was no evidence of dehydration or gross malnutrition at the time of her last self-admission." Id. Moreover, the appellant was able to take care of herself because she "ha[d] a place to live, financial resources . . . , insight into her mental illness, knowledge of the necessity for medication, and a history of self-admissions to hospitals." Id.

Unlike Schexnayder, D.F. conceded that he cannot take care of himself without help. And, unlike the doctor in Schexnayder, Dr. Hernandez testified to the specific harm that would befall D.F. if discharged. Without treatment, D.F. would not take his medication or eat.[4] As noted earlier, D.F. was mildly malnourished and disheveled when he first arrived at the Center. The record also reflects that D.F.'s prior placements in a group home were ineffective.

Although D.F. was mildly, not grossly, malnourished, we are not prevented from concluding that the State presented evidence of specific occasions where D.F.'s failure to take medication and take care of himself resulted in substantial harm to his well-being. We note that the malnutrition followed shortly after D.F.'s last discharge

---

[4]Dr. Hernandez also testified that, without treatment, D.F. has "a higher risk to be wandering the neighborhood, getting lost, maybe being a victim of exploitation due to his mental incapacity to make decisions." However, there was no evidence of any recent behavior that indicated a likelihood that D.F. would wander, get lost, or be exploited. See Boller v. State, 775 So. 2d 408, 410 (Fla. 1st DCA 2000). This testimony, alone, is insufficient to establish any real and present threat of substantial harm to D.F.'s well-being. See Schexnayder, 495 So. 2d at 852. However, the State provided other evidence of self-neglect D.F. would suffer if he was discharged.

from a group home. Thus, the trial court did not err in adopting the magistrate's finding that the State presented clear and convincing evidence that, without treatment, D.F. would pose a real and present threat of substantial harm to himself.

*B.*    *Whether the Trial Court Erred By Adopting the Magistrate's Finding that there were No Least Restrictive Treatment Alternative Available, under Subsection (b)*

D.F. argues that the State failed to show by clear and convincing evidence that there were no other least restrictive placement alternatives. Particularly, D.F. maintains that he is not a dangerous individual and can survive safely with the help of others. D.F. notes that Dr. Hernandez testified about less restrictive alternatives but preferred that D.F. be in a closed facility in Sarasota County. D.F. also recounts that Dr. Hernandez testified that other facilities outside of Sarasota County were willing to accept D.F. if he was willing to go; D.F. testified he was willing to go to a group home.

However, D.F. ignores the evidence that his previous group home placements "backfired." Dr. Hernandez also testified that he recommended the facility in Sarasota County because D.F. refused to go elsewhere. Dr. Hernandez testified, without rebuttal, that D.F. did not have family or friends to care for him. D.F.'s testimony that he could stay with a friend or roommate falls short of suggesting that either was willing and able to help him.

After hearing the testimony, the magistrate recommended the Sarasota County closed facility for placement, finding less restrictive alternatives inappropriate. Under the circumstances, the magistrate's finding was supported by competent, substantial evidence. See B.L.R. v. State, 74 So. 3d 173, 176 (Fla. 1st DCA 2011) (holding that the evidence supported the trial court's order committing appellant to a maximum-risk facility when "the trial court focused on the fact that less restrictive

options had been unsuccessful in protecting the public from [a]ppellant's continued delinquency"); see also Singletary v. State, 765 So. 2d 180, 181 (Fla. 1st DCA 2000) (holding the State failed to prove less restrictive treatment alternatives were unavailable when Ms. Singletary's mother testified that she would take care of her daughter and would move away from their harmful environment); Williams v. Davis, 459 So. 2d 406, 408 (Fla. 1st DCA 1984) ("Once the hospital makes a prima facie showing that the patients meet the criteria, the hearing officer is bound to grant the petition for continued involuntary placement in the absence of contrary evidence from the patient.").

## V.  Conclusion

The trial court did not abuse its discretion in accepting the magistrate's recommendation.  Thus, we affirm the trial court's commitment order.

Affirmed.


CASANUEVA and ATKINSON, JJ., Concur.